JOSÉ AGUSTÍN GUERRA, ETC., Plaintiff and Appellee, *v.* EU-
LOGIO ORTIZ and ROYAL INDEMNITY COMPANY, Defend-
ants and Appellants.

No. 10067.   Argued February 7, 1950.—Decided June 23, 1950.

*Wilson P. Colberg* for appellants.   *Bolívar Pagán* for appellee.

MR. JUSTICE TODD, JR., delivered the opinion of the Court.

Has an unemancipated minor a cause of action against his father, under § 1802 of the Civil Code, 1930 ed., because of damages suffered as a result of the latter's negligence? This is the principal question for decision in the present case. The facts are as follows:

The complaint in this case was filed by José Agustín Guerra as guardian *ad litem*[1] on behalf of a minor, Cruz Ortiz. It was alleged therein that on June 27, 1948 while the minor was riding as a guest of the codefendant Eulogio Ortiz in an automobile owned and driven by the latter, he suffered a fracture of his left arm, of which he has been rendered completely incapacitated; that the accident causing the injury was due to defendant's negligence in having driven the vehicle at excessive speed and without due precautions, which caused the vehicle to collide with a tree; that the minor suffered great physical pains which he estimates at $3,000 and for the physical incapacity of his left arm he claims $10,000. It is further alleged that the defendant's automobile was insured by the codefendant, Royal Indemnity Company, a corporation authorized to do business in Puerto Rico.

The defendants filed a motion for summary judgment in which they stated that the minor Cruz Ortiz is Eulogio Ortiz's legitimate son, was fourteen years old and that on the day of the accident two other minor sons and Ortiz's wife were riding in his car; that the pleadings and evidence submitted in the proceeding for the appointment of a guardian *ad litem* are made a part of the motion by reference thereto; that as appears from the complaint and other pleadings of said proceeding, this is an action of a legitimate son against his father for a tort in which it is alleged that its proximate

---

[1] The lower court had previously appointed him, expressly authorizing him to bring this action.

cause was the father's negligence and that according to said facts the minor plaintiff has no cause of action against his father, codefendant Eulogio Ortiz.

For the purposes of the motion for a summary judgment, the parties made the following stipulation of facts:

"1. That the plaintiff was born on May 3, 1935, and is the legitimate son of codefendant Eulogio Ortiz and Teodora Félix, said spouses having duly married on May 5, 1931.

"2. That the plaintiff has always resided and lived with his legitimate parents, being under their *patria potestas* and custody.

"3. That the plaintiff does not have any resources, depending solely and exclusively for his maintenance and support on his legitimate father, codefendant Ortiz.

"4. That the accident to which this action refers happened while codefendant Eulogio Ortiz was driving his vehicle, riding therein his legitimate mother and his two other brothers, all minors and under the *patria potestas* of codefendant Ortiz, the plaintiff being one of the passengers in the vehicle, together with the above-mentioned persons."

The parties also stipulated the following:

"Both parties in this case, represented by their respective undersigned counsel, also stipulate to pray the court for summary judgment alleging, as they do hereby, respectively, that judgment should be entered for the plaintiff or for the defendants according to the court's opinion as to the legal matters involved, on the merits of the case."

According to this stipulation, the lower court entered judgment for the plaintiff and ordered the defendants to pay to the plaintiff the sum of $8,000, costs and $400 for attorney's fees. Feeling aggrieved by said judgment, the defendants appealed therefrom and allege on appeal that the lower court erred in holding that a minor, who lives under the *patria potestas*, guardianship and custody of his legitimate father, may sue him for damages caused by his father's negligence, and in ordering the defendants to pay $8,000

as compensation for the damages suffered by the plaintiff, without any evidence to that effect and without the case having been submitted on the pleadings.

■ Under § 1802 of the Civil Code, 1930 ed., "A person who by an act or omission causes damage to another when there is fault or negligence shall be obliged to repair the damage so done." Was it the intention of the Legislature in writing this provision in such broad terms, to include a negligent father's responsibility towards his minor son who has suffered damages as a consequence of said negligent action? No judgment of the Supreme Court of Spain, and no commentator of the Spanish Civil Code, interpreting § 1902 thereof, equivalent to 1802 of ours, has been quoted by the lower court or the appellee and we have found none that answers this question in the affirmative. Nor has it been answered in any way in this jurisdiction. Such an absolute absence of precedents seems significant to us due to the nature and scope of the action and the direct effect that it may have on parental relations determined in Title VIII of the First Book of the Civil Code,[2] which are invested with the highest public and social interest.

---

[2] Some of the pertinent Sections provide:

"Section 152.—The *patria potestas* over the legitimate children not emancipated belongs in the first place to the father, and in case of his absence, legal incapacity or death, to the mother.

"Illegitimate children and adopted minors shall be under the *potestas* of the father or mother acknowledging or adopting them. Where they have been acknowledged or adopted by both parents, the provision of paragraph one of this section shall be applicable.

"Section 153.—The father and the mother have, with respect to their children not emancipated:

"1. The duty of supporting them, keeping them in their company, educating and instructing them in accordance with their means, and representing them in the exercise of all actions which may redound to the benefit of such children.

"2. The power to correct and punish them moderately.

"Section 154.—The administration of the property of children under the *patria potestas* belongs in the first place to the father, and in case of his absence, legal incapacity or death, to the mother.

578

It is true that we have decided that under our Civil Code the *patria potestas* is not established for the benefit of the father but for the benefit of the child. *Llopart* v. *Mesorana*, 49 P.R.R. 242 and cases cited therein.[3] Does this mean that if in the exercise of this *potestas* the father commits an act of negligence that should result in damage to his child, this fact is sufficient to create a cause of action in favor of the child? We do not think so. A father's negligence in such a case does not presume or entail any voluntary or perverse action against his child. Had such wilfulness or perversity existed the case would have fallen under other provisions of the Civil Code as well as of the Penal Code. The former, those which may deprive the father of the *pa-*

"Section 155.—Property acquired by an unemancipated child by labor or industry, or for any valuable consideration, belongs to the said child, but the usufruct thereof belongs to the parents having *potestas* over him whilst he lives in their company; but if the child, with the consent of his parents, lives independently, he shall be deemed emancipated for all effects as regards the said property, and he shall be the full owner and have the usufruct and administration thereof."

"Section 158.—The parents, as regards the property of a child in which they possess the usufruct or administration, have the same obliga- tions as any other usufructuary or administrator, as well as the special obligations on legal mortgage established in the Mortgage Law.

"An inventory shall be made, with the intervention of the public attorney, of the property of children of which the parents have only the administration; and, on petition of the said public attorney, the district court may decree that the securities belonging to the child be placed in deposit."

"Section 160.—Whenever, in any matter, the father or mother have interests opposed to those of their unemancipated children, the district court shall appoint for the latter a person to defend their interests, who shall represent them in or out of court.

"The district court, on petition of the father or mother, the minor himself, the public attorney or any other person capable of appearing in a suit, shall appoint, as the person to defend the interests of the said unemancipated child, the relative who, in a proper case, would act as his tutor by effect of the law, and, in his default, to another relative or any other person."

[3] The jurisprudence of the Supreme Court of Spain has developed in the same way. See Castán *Derecho Civil Español, Común y Foral* vol. 4, 6th ed. (1944) p. 37 and the Decisions of May 24, 1909 and June 24, 1929.

*tria potestas* under § 166 of the Civil Code [4] and the latter, those which impose the corresponding penal sanction to the unlawful action.

As Manresa says, commenting on § 1902 of the Civil Code of Spain, equivalent to 1802 of ours, and at the same time referring to Sánchez Román:

"That is, the idea of guilt, as Sánchez Román says, implies the voluntary violation of another's right with which prejudice, damage or offense is caused against him to whose legal patrimony the said right belongs: but such violation causing the damage or prejudice, has to be independent of any previous agreement and that is why this guilt is known by the name of *extracontractual*. On the other hand, *in negligence, there is no positive act from the one responsible of it, nor is there active will or intention,* but merely an omission of the duties of prudence, foresight, or vigilance, which the law requires." (Italics ours.) XII Manresa, *Comentarios al Código Civil Español,* 4th ed., p. 541.

To sustain the right to such actions would open a dangerous gap in the family unity, created under the rule of the *patria potestas* exercised by the father, or by the mother in the cases provided by § 152, *supra,* not only for the benefit of the children but also, as Manresa comments, for the benefit of the state, since it is necessary ". . . for the interest of public policy and social welfare, that the paternal authority be firmly established so that a steady and permanent discipline should prevail in the family, in order that it may give forth well-educated citizens respectful of the laws and magistrates of their country." II Manresa, *op. cit.* 6th ed., revised by Francisco Bonet Ramón (1944), p. 10.

---

[4] Section 166 provides the following:

"The courts may deprive parents of the *patria potestas* or suspend the exercise thereof, if they treat their children with excessive harshness, or give them commands, advice or examples of a corruptive nature, and shall name a tutor, in accordance with law, for the persons of the said children. In such cases, they shall also deprive the parents of the usufruct and administration of the property of the children, and adopt such measures as they shall deem expedient in the interests of the latter."

580

■ There is another factor of great importance which we must consider in deciding the question raised. That is, that under § 155 of the Civil Code, *supra*, although the property acquired by an unemancipated child, belongs to him, ". . . the usufruct thereof belongs to the parents having *potestas* over him whilst he lives in their company . . .", the parents having, in addition, according to § 154, *supra*, the administration of said property. An abnormal situation, not to say immoral, would thus arise, therefore, where the father would become the administrator and usufructuary of that which, due to his negligent action, his son obtained. It could be argued that such rights of administration and legal usufruct granted to parents could be waived by them. The commentators of the Spanish Civil Code maintain the opposite. Castán says, *op. cit.*, p. 52:

"It has been argued whether the rights of administration and usufruct granted to parents may be waived, and the solution of the problem depends on whether those rights are considered as of a public or merely private interest. In our opinion (which prevails among the authors, who, like Mucius Scaevola and Valverde, study the problem) there is no possible waiver in this matter, because the rights in question are inherent in the *patria potestas,* and *this institution is, more than a right, a function of notorious public interest and social nature.* Particularly in relation to administration, the theory of unwaiveability is highly manifest, as the management of the son's estate is but a direct consequence of the duty of aid and protection which is blood and flesh of the *patria potestas.*"

In addition, said author calls attention to § 108, clause 7 of the Mortgage Law which provides that the usufruct right granted by law to parents over their children's estate shall not be mortgaged, which ". . . supports the doctrine of inalienability and therefore, of unwaiveability, for a waiver is a form of alienation." As to this phase of the question, Mr. Luis Muñoz Morales says in his *Lecciones de Derecho Hipotecario*, vol. II, p. 52:

"The usufruct belonging to parents with regard to their minor children's estate and governed by §§ 155 and 156 of the Civil Code, is not subject to mortgage because this fundamental factor in the institution of the *patria potestas* and its economic aspect is considered with regard to the children's estate and the fulfillment of their paternal duties. . . ."

There always arises, as a bar, the fundamental factor of the institution of the *patria potestas*, that of the family unity in attempting to justify this type of actions. It does not matter that in the Dominion of Canada, under a provision of the Civil Code of Quebec similar to that of § 1802 of ours, it was said in *Fidelity & Casualty Co.* v. *Marchand*, 4 D.L.R. 157 (1924), that the minor had a right of action against the father, the rule of *lex non distinguit* being applied by one of the justices,[5] while another states that the case apparently falls under § 1053 of the Civil Code but that "it is not necessary to determine that important question on this appeal." As a matter of fact, what was said by the other Justices is *obiter*, as the appeal in said case was from a judgment for the father against the insurance company to collect the $5,000 which the former had been ordered to pay in the suit for damages brought by his son, represented by his guardian. Since the father paid the money to his son before the term for appealing had expired, it was decided that the father had violated several clauses of the insurance contract which bound him to render all his cooperation to the company and so the action was dismissed. Even if what was said by several of said judges were not *obiter*, we are not bound to accept their interpretation of § 1053 of the Civil Code of Quebec as a rule to apply it to § 1802 of ours.

Likewise what was decided in *García* v. *Fantauzzi*, 20 F. 2d. 524 (C. A. 1, 1927) is neither an obstacle nor contrary to the conclusion we reach in the present case. It was decided in said case that a natural child had a cause of action

---

[5] Apparently each Justice delivers a separate opinion as there are five in said case.

under § 1802, *supra,* against his presumptive father in a complaint for damages, when it was alleged in the complaint that not only had the father refused to recognize him as his child but voluntarily and criminally and conspiring with other persons through the payment of money, induced the plaintiff's mother and a colored barber, through fraud, to appear before a notary and execute a public document in which said barber recognized the plaintiff as his son, making them believe that he was only adopting him. The complaint was dismissed in the lower court,[6] on a demurrer, for failing to state facts sufficient to constitute a cause of action. Upon reversing, the Circuit Court decided, on pp. 527 and 528:

"Correctly analyzed, the case stated is not for filiation or for present or future support or to be declared an heir. *Nor is it a suit, by a child living in the family, against the father. It is a suit to recover damages based on defendant's fraudulent avoidance of his statutory duty to support and educate by conspiring with others to cause the plaintiff's paternity to be ascribed to the negro barber.*

".    .    .    .    .    .    .    .

"We do not overlook the doctrine of such cases (authorities). These cases hold it contrary to public policy to permit a minor child, *living in the family,* to sue a parent in tort for damages. Defendant's learned counsel does not cite these cases nor urge their doctrine as applicable to this case, in which the plaintiff *has never been a part of the defendant's family.* We concur in the view, thus implied, that the public policy favoring family unity cannot be invoked to defeat a claim for damages arising out of a breach by the defendant of every obligation arising from the limited family relationship imposed by the statutes of Porto Rico on the father of a natural child. . . ." (Italics ours.)

As may be seen, the case *García* v. *Fantauzzi* rather agrees with the doctrine we establish in the present case in interpreting § 1802 of the Civil Code. It did not involve an action based on the father's negligence but rather fraudulent acts

---

[6] The United States District Court for Puerto Rico.

voluntarily performed by the father in order to prejudice the rights of a natural child who never was a part of his father's family and the Court of Appeals recognized that the public policy favoring family unity could not be invoked. Be that as it may, and a local question being involved, it is the duty of this Court to interpret, for the first time, the scope of § 1802 in connection with the action brought herein.

■■ It is argued that if § 160 of the Civil Code authorizes the appointment of a guardian *ad litem* for the unemancipated children to represent them in and out of court, whenever in any matter the father or mother has an interest opposite to theirs, it means that the child may sue his father for damages, as this is a matter in which they have an opposite interest. We do not agree. Section 160 is included under Chapter III of Title VIII which deals with "Effects of 'patria potestas' upon the property of the children." The "opposed interests" to which said Section refers have been construed in the sense that an incompatibility of interest exists as to certain property because parents and children, for example, may be coheirs of the same inheritance of heirs and legatees respectively of the same estate. Judgment of the Supreme Court of Spain, November 6, 1934. As Manresa says, *op. cit.* pp. 68, 69 and commenting § 165 of Spain, equivalent to § 160 of ours:

"Under this rule a conflict of interest arises when the personal interest of the father is contrary to that of his children, so that the former in order to seek his own defense feels compelled to handicap the condition or position of the latter, the advantages of one being derived from the damage to the other. Under such hypothesis the father lacks the necessary composure to *protect his children's interest.*

"The conflict should be *actual and effective,* or though potential and future, *certainly verifiable* and not merely hypothetical. . . ." (Italics ours.)

The whole concept of the conflicting interest is based on something real and effective and if, as we are deciding, the

unemancipated minor child has no right of action against his father, in cases like the present one, no conflicting interest arises or exists between them.

■ It is argued, in addition, that there is no legislative determination that this kind of action militates against the public policy of the state. Such express provision is not necessary. We have already said that the family unity, the institution of the *patria potestas*, the paterno-filial relations as recognized by decisions and authorities on the matter, are invested "per se" with a high public and social interest, for the benefit of the child as much as for the state.

■ The appellee maintains, finally, that since the. insurance company which issued the insurance policy covering the damages caused by the father's negligence is a codefendant, it is not incumbent on the father to pay the amount of the judgment and that in any event he (appellee) has a cause of action against the insurance company under § 175 of the Insurance Act of Puerto Rico. We have decided otherwise. In *United States Casualty Co.* v. *District Court*, 66 P.R.R. 884, 886, we said:

". . . In order that plaintiff may obtain a judgment against the insurance company it is necessary that the assured be liable for the damages caused, otherwise the company is not liable. . . ."

To the same effect we said in *Bithorn* v. *Santana*, 68 P.R.R. 281, 285, that "the liability of the insurer is contingent upon the liability of the assured" and that therefore, a complaint against the insurer alone, before obtaining a final and unappealable judgment against the insured, does not adduce a cause of action.

If, as we hold, there is no cause of action against the father, there is none against the insurance company either.

We have sought to decide the case within the framework of our Civil Code, as we considered that the question of public and social interest involved requires an interpreta-

tion of the scope of § 1802 in connection with the cause of action brought. Notwithstanding this, we can say that the same doctrine prevails in a majority of state jurisdictions under American common law, even when there exists an insurance policy. See annotations in 31 A.L.R. 1157; 71 A.L.R. 1071; 122 A.L.R. 1352 and Torts Between Persons in Domestic Relations by William E. McCurdy, 43 Harv. L. Rev. 1030; 14 Tulane L. Rev. 468. It is significant that in Louisiana, pursuant to § 104 of the Code of Practice, this kind of actions is expressly forbidden.

To illustrate the prevailing common law rule, in *Luster* v. *Luster*, 13 N.E. 2d 438, 439 (Mass., 1938), the following was said:

". . . Probably it should be conceded at the outset that pure logic interposes no obstacle to such an action. But from the practical viewpoint of sound public policy serious objections present themselves immediately and forcibly. Such actions, at least when not collusive, would almost inevitably tend to the destruction of the peace and unity of family life and to the impairment of parental authority and discipline. In the continued intimate contact between parent and child through the long years of the child's minority many occasions must arise out of which claims, real or specious, could be made that the parent had been negligent in some matter of commission or omission to the injury of the child. During the minority of the child such claims, even if valid, commonly could be investigated and prosecuted only through the intervention of outsiders whose intrusions, not always disinterested, into the intimacies of family life would seek excuse and justification on the ground that perhaps a cause of action might be unearthed for the benefit of the child. The action now before us was brought through a second cousin of the plaintiff who was appointed his guardian a few weeks after the accident. An equally repellant alternative would be the saving up of such claims to be prosecuted by the child himself after reaching his majority, when the claims may have become stale and the witnesses no longer available. We are unable to accept the theory that the family as the ultimate social unit is so far moribund that these considerations have ceased to have vitality."

And as it was said in *Securo* v. *Securo*, 156 S. E. 750, 751 (W. Va., 1931) : "It is deemed better that an occasional wrong should go unrequited than that family life should be subjected to the disrupting effects of such suits."

In fact, we believe that in interpreting the provisions of our Civil Code in this fashion, we tend to strengthen the family unity, even though incidentally and in some isolated case, an unemancipated child living with his father and receiving support, education, and instruction from him, may suffer damages caused by his father's negligence. This family stability should not be destroyed at the expense of granting the child a sum of money as compensation for the damage caused.

The judgment will be reversed and a new judgment entered dismissing the complaint, with costs.